Filed 1/28/20

**CERTIFIED FOR PUBLICATION**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>DANNY REUBEN KERBS,<br><br>     Defendant and Appellant. | A155126<br><br>(Sonoma County<br>Super. Ct. No. SCR-25640) |

Appellant Danny Kerbs appeals from the trial court's order extending his civil commitment at Napa State Hospital under Penal Code section 1026.5[1] for two years, until June 2020.  He contends (1) substantial evidence does not support the commitment extension, and (2) the extension order must be reversed because the record does not affirmatively establish that he knowingly, intelligently, and unconditionally waived his right to a jury trial. Because we conclude the commitment extension is not supported by substantial evidence, we shall reverse the court's order.

### PROCEDURAL BACKGROUND

Appellant was originally found not guilty by reason of insanity (NGI) of one count of assault with a deadly weapon (§ 245, subd. (a)(1)) in 1998.  He was committed to the state hospital system for a maximum term of four years.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

The original offense was described in an October 4, 2017 extension report as involving appellant allegedly coming upon a man at the side of the road who was fixing his vehicle, grabbing a screwdriver from the man and shouting, " 'Get away punk or I'll kill you.' He later allegedly stated he thought the man was a 'shady character.' " Upon his arrest, police officers described him as "paranoid, delusional, agitated, hostile, and threatening." In addition to the assault with a deadly weapon charge, appellant was initially charged with making criminal threats (§ 422), exhibiting a deadly weapon (§ 417, subd. (a)(1)), and theft (§ 484, subd. (a)). Appellant pleaded no contest to the assault charge, the court found him NGI, and the latter three charges were dismissed.

Other than two limited periods of release to the Conditional Release Program (CONREP),[2] appellant's commitment was extended multiple times over 20 years, pursuant to section 1026.5, subdivision (b).

On January 24, 2018, the Sonoma County District Attorney filed a petition under section 1026.5 to extend appellant's civil commitment at Napa State Hospital for two additional years.

On July 10, 2018, at the conclusion of a bench trial, the court sustained the petition and extended appellant's commitment until June 8, 2020.

On August 21, 2018, appellant filed a notice of appeal.

## FACTUAL BACKGROUND

At the bench trial, which took place on July 8 and 9, 2018, the following evidence was presented.

---

[2] In 2009, appellant had agreed to an extension of his two-year commitment with the understanding that he would be placed in CONREP. In 2011, appellant again agreed to a two-year extension of his commitment, contingent on his acceptance into CONREP. The Services provided by CONREP are authorized by section 1615.

Dr. Cheryline Mancusi, a staff psychologist at Napa State Hospital, testified as an expert in the area of violence risk assessment, psychodiagnostic assessment, and psychological treatment. Dr. Mancusi had been appellant's unit psychologist for about four and one-half years. She interacted with appellant about once a month, including during quarterly treatment conferences and on the unit.

Dr. Mancusi opined that appellant, who was 61 years old at the time of trial, suffered from schizophrenia, with symptoms present over a continuous period of time. During the time she had worked with appellant, he had "primarily exhibited negative symptoms of schizophrenia," which included "apathy, avolition, or lacking motivation, lethargy. His grooming and hygiene ha[d] varied from poor to fair." Dr. Mancusi had "also witnessed some periods where he ha[d] displayed delusional beliefs," though this was less frequent than the negative symptoms that she had observed. Some of the delusions appellant had expressed "included reporting that various staff members or individuals are on drugs, accusing individuals of being child molesters." He had described his training in detecting drug use and had "also talked about owning various properties in various areas." Dr. Mancusi had periodically discussed appellant's diagnosis and symptoms with him, and his responses had varied over time, with him sometimes acknowledging the diagnosis and stating he agreed with it and at other times stating he believed it was "more of an anxiety condition."

Dr. Mancusi believed that, due to appellant's "lacking engagement in treatment and lacking insight into his mental disorder," he did "continue to pose a significant risk for violence without sufficient support and supervision."

As far as Dr. Mancusi knew, appellant had not had any violent incidents in the past year, but he had made statements that concerned her. First, in September 2017, during a therapeutic community meeting, "appellant suddenly shouted out that [Dr. Mancusi] or the staff called the patients violent when in fact [the staff is] violent." Second, in August 2015, appellant was standing in the hallway waiting for his medications when another patient made a gesture indicating that appellant was "malodorous." When Dr. Mancusi intervened, appellant exclaimed, " 'You see what he did to me?' And, 'You shut up. You're on drugs, and I'm going to report you.' " Dr. Mancusi had not observed any other outbursts by appellant in the years he had been her patient. Nor was she aware of him engaging in any physical violence since his return to the hospital, following his almost one-year release to CONREP in 2011.

With respect to appellant's lack of engagement in treatment, which included medication treatment, psychological treatment, and recreational activities, appellant's engagement was "fairly poor." Although he "does take his medications regularly, on a daily basis . . . , at times this does require a prompting from nursing staff to come and get his medications." Appellant had said that his medications helped him with anxiety, but had not acknowledged the risk for engaging in violent behavior if he stopped taking them.

When asked whether she believed appellant would take his medication in an unsupervised environment, Dr. Mancusi testified that he had "expressed [an] intention to continue his medication, and I do believe that he would follow through on that intention." She was concerned, however, about the possibility that without support and prompting, he may miss his medications. If appellant were to stop using his medications, there was "a

4

good chance" his schizophrenia symptoms would become more pronounced and "a probability that delusional beliefs may become more apparent and that he may act on those beliefs."

Regarding appellant's engagement in psychological treatment, Dr. Mancusi believed that appellant had become less trusting of his treatment team in recent years, based in part on his delusional belief that staff members were using drugs. Appellant had not attended any of his core groups over the past year and had declined most of Dr. Mancusi's attempts to meet with him individually. Required core groups that appellant was expected to attend included a weekly Wellness Recovery Action Plan group, which helps patients learn how to manage warning signs that they are having symptoms and triggers for their symptoms. Patients also worked on crisis planning and building a support system. Other groups dealt with symptom management, emotion management, and coping skills. Appellant had occasionally participated in recreational activities, such as bingo and fundraisers. Dr. Mancusi was concerned that if appellant were removed from the support and continued prompting and encouragement he received in the hospital, his already minimal level of engagement would decline significantly.

Appellant's lack of engagement in treatment was connected to dangerousness in that "[i]ndividuals who tend to be more consistent in their treatment engagement tend to be more consistent in acknowledging their mental illness and possibilities of warning signs and triggers coming up, therefore, having more of a plan to address these should they arise." Appellant had often cited fatigue as an issue that got in the way of his attending groups. He had, however, also said that he did not believe he needed psychological treatment or that it was beneficial to him, which was related to his insight. His failure to engage in treatment gave him less

opportunity to understand his illness, which could lead to a "significantly greater risk of not adhering to treatment, not adhering to medication."

Dr. Mancusi believed appellant's insight into his history of violence was "poor." He had stated that he was never violent in the past and had not acknowledged having any future risk for violence. Nor had he "acknowledged the actual behaviors he's engaged in that are considered violent or threatening." This lack of insight and failure to acknowledge his risk for violence increased appellant's dangerousness because "he has not considered what situations he needs to be aware of, what plans . . . for himself he needs to have in order to prevent violence in the future."

When asked whether, as a result of his schizophrenia, appellant had serious difficulty controlling his dangerous behavior, Dr. Mancusi opined that, as with his dangerousness, "because of his lacking engagement in treatment and lacking insight into [his] mental illness, he continues to pose a significant risk."

Dr. Mancusi had last conducted an HCR-20 assessment of appellant the previous year, in September 2017. Based on that assessment, which assists in determining a patient's overall risk for violence, she estimated that appellant's risk for violence in the hospital was in the low range. His risk in the community without supervision, however, was in the high range due to his failure to show a consistent understanding of his mental illness and the need for treatment, as well as concerns about his willingness or ability to follow through on his treatment plan. "[I]f his treatment compliance declined in the community, he would be at risk for decompensation and possible violent behavior."

Dr. Mancusi had spoken to appellant about his prior releases to CONREP and about why he had not been successful in that program. His

account, which was fairly consistent with what was documented in CONREP's report, was that he had missed the bus to get to a group and had also not completely followed through on engaging in certain groups; he had also slept through some of his groups. Dr. Mancusi was concerned that if he were released, appellant would continue to demonstrate similar behaviors. She was particularly concerned that he might sleep through his medication times, which, over time, "could cause him to potentially be at risk of acting out . . . ."

On cross-examination, Dr. Mancusi acknowledged that she had never seen appellant "place his hands on anyone," but she had "witnessed him act in an intimidating manner." Appellant did not believe he needed psychotherapy, but he did express a willingness to work with CONREP and comply with treatment in the community. Appellant also said that he did not feel motivated to attend therapy sessions and classes in the hospital because his medications made him tired and also because he had been doing the classes over the past 20 years and believed he had gotten what he could out of them. Dr. Mancusi also acknowledged that when she first started working with him, appellant had been participating actively in treatment and attending groups, during which time he was "showing a lot of insight, engaging in discussions about symptoms and warning signs. All sorts of discussions we were having. He was encouraging of other patients. And that participation began declining over time."

Dr. Mancusi had recently asked appellant, in March 2018, whether he believed he had a mental illness, and he responded, " 'I guess schizophrenia. It just means you have thoughts other people don't have.' " Appellant also said that the schizophrenia comes out in paranoia and anger at his symptoms, and that his symptoms may get worse if he stopped taking his

7

medications. Dr. Mancusi acknowledged that these statements were consistent with appellant having insight that he needs to take his medications to avoid decompensating. Appellant had also said that he needed to keep taking his medications.

Appellant also told Dr. Mancusi in March that " '[m]y anger makes me appear, because I'm a big man, to be a threat. I think a lot of people get away with a lot more than I do. The moment I start to spout out, I seem to be taken very seriously and they think I'm a threat. It means I have to be more aware of my feelings and emotions. Sometimes I think that's why the meds are necessary. It keeps me in check and then no one has a gripe about me really.' " In response to this statement, Dr. Mancusi had written, "Similar to [appellant's] growing acknowledgement of his mental illness, this acknowledgement of the impact of his presentation shows progress.' " Finally, appellant expressed willingness to work with CONREP and also said that if he is successful on CONREP, he wants to return to Portland, where he is from, and work with an outpatient clinic there that he had worked with previously.

Dr. Domingo Laguitan, a staff psychiatrist at Napa State Hospital, testified as an expert on treatment of NGI offenders and mentally disordered offenders (MDOs). Dr. Laguitan had been appellant's treating psychiatrist for approximately four years. He spoke with appellant regularly in the hallways, met with him about once a month, and had quarterly conferences with him.

Dr. Laguitan opined that appellant suffers from schizophrenia. His symptoms included "positive symptoms," including delusions and false beliefs, and "negative symptoms," such as apathy and the inability to maintain his hygiene. Appellant's delusions included his belief that hospital

8

staff members had mental illness, used drugs, and did not want to let him out of the hospital. Appellant's illness had been most severe in 2015, when Dr. Laguitan had made some medication changes that caused a significant increase in his symptoms, including greater hostility, although he never physically attacked anyone. Once the medications were readjusted, appellant's verbally aggressive behavior abated.

Appellant was currently taking an antipsychotic medication called Lurasidone and a mood stabilizer called Valproic Acid, which were most effective at treating his symptoms. With the Lurasidone, it would "take many doses of missing it generally before we see any kind of changes." If appellant did not take the Valproic Acid, there would be "potentially more impulsivity," with a more changeable mood. The side effects of the Lurasidone included sedation, weight gain, and slowed thinking. With the sedation effects, a patient may have trouble rousing from sleep, may need a lot of sleep, and will not be as alert as they would otherwise be when awake. Dr. Laguitan testified that appellant's ability to engage with treatment professionals and group sessions was affected to some extent by being on the Lurasidone. Appellant had never refused to take his medications during the four years he had been Dr. Laguitan's patient.

For the past year or two, appellant's symptoms of "believing certain things" had not translated into him "being imminently dangerous to others. We're able to communicate with him. We have sessions that go on. And we're able to convey thoughts between ourselves, his thoughts to me, and vice versa. [¶] So he's able to function in the unit independently. He goes to his meals and takes his medications." At that level of function, he could participate in his treatment plan, but Dr. Laguitan believed "he's just not convinced these are the things that he needs to do." Dr. Laguitan had not

9

seen appellant behaving in a hostile, angry manner since appellant's medications were changed in 2015.

Dr. Laguitan opined that, as a result of his schizophrenia, if appellant were released into the community at the present time, he would pose a substantial danger of physical harm to others and that, furthermore, appellant had serious difficulty in controlling his dangerous behavior.

Dr. Laguitan based these opinions on the fact that schizophrenics can become dangerous when the illness is not treated adequately and the fact that, at the time of the original offense, appellant's "uncontrolled illness . . . has been associated with dangerous behavior." Dr. Laguitan further explained that schizophrenics "need lifelong care in terms of medications, psychotherapeutic support, psychosocial support." In addition, various symptoms, including delusions, can be associated with dangerousness. Appellant continued to deny the 1997 offense as it was described in the records, stating that he had "never been aggressive or dangerous in his life." Dr. Laguitan also referred to records from appellant's initial admission to Atascadero State Hospital 20 years earlier, indicating that appellant's "mental state at that time" when "his illness was not taken care of . . . was associated with aggression and hostility."

There had been periods when appellant attended his core groups more consistently but, at least for the last quarter, he had not attended any of them. He had, however, attended most of his treatment conferences. Over the past year, appellant had acknowledged that he has symptoms and a mental illness, although not necessarily schizophrenia. He also acknowledged his need for medications, "[n]ot just to make himself calm, but to control his anger." Appellant had also said that he would "go on to follow a

treatment program." All of this was an improvement from the previous year, but was not enough for a recommendation of release to CONREP.

Dr. Laguitan testified that appellant believed he suffered from "manic-depressive disorder." At a recent treatment conference, in April 2018, appellant had "said that he didn't have schizophrenia; although at the same time, he clarified that he wasn't saying that he does not have a mental illness. So the implication of that statement is that he acknowledges some form of mental illness; it's just not schizophrenia." Appellant also said he " 'will follow up with mental health.' "

Dr. Laguitan noted that appellant had been returned to the hospital from CONREP for failing to fully engage in the CONREP program and, since then, he had not been working on the reasons he was returned to the hospital. Dr. Laguitan therefore believed that "it's unlikely that he'll be able to follow up with CONREP, even with the structured setting of CONREP right now, that I don't think he will be successful." If appellant failed to engage in treatment, "then the symptoms will get worse, to the point that it could descend or devolve into the kind of mental state when the instant offense happened," as well as other past instances in which records showed that "violence and aggression was [*sic*] exhibited during the times that he was not taking care of his illness . . . ." Appellant's delusions, such as when he "accuse[d] people of being child molesters, rapists, drug dealers," were of the kind that "arouse anger and hostilities toward others."

When asked what appellant needed to do—besides engaging in therapy and gaining insight into his mental illness, symptoms, and risk for violence—to get to the point where he would not pose a danger to others and would be able to control his behavior, Dr. Laguitan responded that that was "the basic thing . . . . [Appellant] is doing a lot of things right in the unit. Actually . . . ,

11

he interacts with, you know, others. Otherwise, aside from these instances, appropriately he takes his medications, he works with me, and we have conversations. He has not been involved in, you know, aggressive act[s] toward others for [an] extended period of time. So a lot of things are in place, and it's just engagement that is, you know, obviously lacking."

Dr. Laguitan did not believe that appellant's medication compliance alone would be enough to keep his mental illness under control, stating that there are "psychotherapeutic and psychosocial supports that are also useful for mental illness in general. And it's usually a combination of all these treatments that provide the best results." Moreover, unlike the structured environment of the hospital, where staff ensured he received his medications, there might not be as many safeguards in a less restrictive setting, and he would have to use his insight and abilities to make himself get the treatment he needs. Dr. Laguitan had "doubts" about whether appellant would continue to take his medications in an unsupervised environment.

On cross-examination, Dr. Laguitan acknowledged that appellant had never refused to take his antipsychotic and mood stabilizing medications. During their last treatment conference approximately two months before trial, appellant said he would continue to take his medications if he were released from the hospital. When asked by appellant's attorney whether appellant posed a substantial danger of physical harm to others now, while taking his medications, Dr. Laguitan responded that he had to "qualify, you know, imminently. Like right now, no, he's not. If he's outside in the community right now, he's here in the courtroom, he's not imminently, in my opinion, going to be dangerous to others. You know, the question is, through time—and I cannot prescribe any kind of time frame for that. You know, less restrictive setting, would he continue to do the things that he needs to do to

keep himself well?  And that's where the concern is.  It's just that, my opinion that, right now, I don't have, because he doesn't come to groups, I don't know what he knows or what he intends to do, or does he even have the ability to recognize his symptoms right now?  It's the question of his compliance to treatment that, down the line, will make him decompensate and be in a mental state when he becomes dangerous."

Finally, Dr. Laguitan acknowledged that even in 2015, when appellant became more verbally aggressive while Dr. Laguitan was adjusting his medications, he never physically attacked anyone and, once his medications were readjusted, his aggressive behavior abated.

Appellant testified on his own behalf.  He stated that, in addition to medication for physical ailments, he was taking an "anti-psychotropic," and "a mood stabilizer."  Appellant believed that he required medication and that it kept his mental illness "in check."  He also believed that "I have a[n] anger problem, that sometimes has led me into trouble.  And I think that it happened and occurred when I was not on my medication."  Appellant had taken his medications when he was previously on CONREP and would continue to take them if he were released again.  If he did not take his medications, appellant thought he "would decompensate, and be more easily angered in situations, less tolerant of certain people's attitudes, and perhaps carry a bit of prejudice towards certain individuals."

If he were released to CONREP, appellant understood that he would have to participate in classes, counseling, and group therapy sessions.  He would also probably have to do some volunteer work and work on weight control.  When he was previously on CONREP, there was a woman who "ran the house" he lived in who distributed the medication morning and evening.

On cross-examination, appellant testified that he had been at Napa State Hospital for 21 years and that he did not think there was anything else the hospital could do for him. He had received a letter in the mail from the director of the hospital six years earlier stating that there was nothing more that could be done for him there. When asked why, if he knew he had to take classes and participate in therapy to be successful if he were released to CONREP, he was not doing those things now in the hospital, appellant stated, "[b]ecause I believe the core groups are redundant, to have to go over them again and again to do the classes that I've already taken." He did not agree that participation in core classes had anything to do with his being dangerous "[b]ecause I'm not harming anybody. I'm not harming myself. I'm not aggressive towards anybody else." When asked if he believed he had schizophrenia, appellant stated that he believed he was "manic-depressive," which meant that he had long periods with lots of energy and then long periods where he was "in kind of a slow slump and fe[lt] depressed." This belief was based on diagnoses doctors had made in the 1980s, before his present commitment.

Also on cross-examination, appellant testified that he had some property that people "owed" him, that he had made some recordings that were placed in the Rock and Roll Hall of Fame, and that staff in the hospital used drugs. Appellant also believed Drs. Mancusi and Laguitan expected him to pay them to get out of the hospital. Under additional questioning by the court, appellant testified that he believed Dr. Mancusi used drugs, specifically hallucinogens and heroin, and that Dr. Laguitan used drugs such as heroin and alcohol. He did not believe this was a delusion. Appellant also believed that hospital staff gave drugs to patients.

14

When the court asked about the offense for which he was originally committed, appellant testified that he had walked past a van with tools lying on the ground. He picked up a handkerchief with a screwdriver inside of it. He threw the screwdriver to the side and a man approached him who seemed hostile and angry. Appellant could see why the man was angry since appellant had just taken his screwdriver. Appellant had thrown the screwdriver to "defuse the situation" because he thought the man had been waiting for him and was going to use the screwdriver on him. Appellant also said he threw the screwdriver "[j]ust to bother" the man because he saw that the man "was sitting there with a screwdriver" and he did not like the man's attitude. After appellant walked past the man, a police officer came and reached into appellant's pants and groped his buttocks. Appellant "screamed rape." He believed the police falsely claimed he had been threatening the man with the screwdriver because they wanted "[t]o get a longhair off the street" and to cover up the officer's inappropriate search. Appellant was not on any antipsychotic or mood stabilizing medications at the time of the incident with the screwdriver.

At the conclusion of trial, the court stated that "some time after the CONREP of 2011, [appellant] gave up. I understand he's been there 21 years. I understand, from a human standpoint, I can understand why he doesn't go to some of these sessions. Been through them several times. They just, and they haven't taken on him. He goes and goes and goes, and nothing happens. He doesn't move out. And he says, to heck with them. I've been through it. I'm not going to participate anymore. I'm not getting anything out of it. And so I think he came to that realization sometime after the second CONREP, the years in CONREP where they pulled him back into the institution.

15

"I believe his lack of insight is significant. He still believes what happened back then, the crime itself, I believe that's delusional. If he had somehow come to grips with that, that that was a delusion as opposed to reality, that might be a step toward his getting out. But he hasn't come to that. In addition, he believes the D.A. has conspired with the cops to cover up what actually happened. . . . [I]n my experience, that's a delusion. And that hasn't been swept out of his mind. He's sure all of that happened."

The court continued: "His final argument, essentially I believe he's medication compliant, and I think he would take his medication when he's outside. . . . But I just don't see how he's come to grips with what's going on. [¶] And when he believes he's wronged somehow, in a delusional state, I think that I believe he's capable of going off. I'm not sure what could be accomplished since both the doctors and he are at loggerheads with regard to the continued participation. I don't know if he'll do it with any degree of zeal. But they're going to require it.

"I don't feel comfortable at all that he has learned anything about his actual situation while he's been in the institution. For that reason, based on the evidence I've heard, the court finds the People's Extension Petition true beyond a reasonable doubt, and does find that he's a danger. Recommittal is ordered. He continues to represent a substantial danger of physical harm to others. His commitment is extended by two years."

## DISCUSSION

### *Sufficiency of the Evidence to Support*
### *the Commitment Extension Order*

Appellant contends substantial evidence does not support the trial court's finding that, due to his schizophrenia, he represents a substantial danger of physical harm to others and has serious difficulty controlling his potentially dangerous behavior.

16

Pursuant to section 1026.5, subdivision (a)(1), an NGI defendant committed to a state hospital after being found not guilty of an offense by reason of insanity pursuant to section 1026 "may not be kept in actual custody longer than the maximum term of commitment." (§ 1026.5, subd. (a)(1).) However, under section 1026.5, subdivision (b)(1), an NGI defendant may be committed beyond the term prescribed by subdivision (a) if he or she "has been committed under Section 1026 for a felony and," after a trial, the trier of fact finds that he or she "by reason of mental disease, defect, or disorder represents a substantial danger of physical harm to others." (§ 1026.5, subd. (b)(1) & (b)(3); see *People v. Zapisek* (2007) 147 Cal.App.4th 1151, 1159 (*Zapisek*).) Proof of dangerousness also requires proof that the NGI defendant has "at the very least, serious difficulty controlling his potentially dangerous behavior." (*Zapisek*, at p. 1165.)

Under this procedure, the NGI defendant is entitled to a jury trial and representation by counsel, to discovery under criminal rules, to appointment of psychologists or psychiatrists, and to "the rights guaranteed under the federal and State Constitutions for criminal proceedings," including the right to a jury trial. (§ 1026.5, subd. (b)(2)-(7).) If the trier of fact finds that the NGI defendant does represent a substantial danger of physical harm to others, he or she may be recommitted "for an additional period of two years from the date of termination of the previous commitment." (§ 1026.5, subd. (b)(8).) Further extensions can be sought at two-year intervals thereafter.

The NGI defendant also may assert as an affirmative defense that he can control his dangerousness through taking medication in an unsupervised environment. (See *People v. Bolden* (1990) 217 Cal.App.3d 1591, 1600, 1602 (*Bolden*) ["section 1026.5 can reasonably be construed to require [an NGI defendant] who has been absolved of criminal responsibility for a felony

17

because of his mental illness and who has already demonstrated his dangerousness to persuade the trier of fact, by a preponderance of the evidence, that his medication is effective in controlling his behavior and he will, in a completely unsupervised environment, take his medication without fail"]; CALCRIM No. 3453.)[3]

" ' " 'Whether a defendant "by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others' under section 1026.5 is a question of fact to be resolved with the assistance of expert testimony.' [Citation.] 'In reviewing the sufficiency of evidence to support a section 1026.5 extension, we apply the test used to review a judgment of conviction; therefore, we review the entire record in the light most favorable to the extension order to determine whether any rational trier of fact could have found the requirements of section 1026.5(b)(1) beyond a reasonable doubt. [Citations.]' [Citation.]" [Citation.] A single psychiatric opinion that an individual is dangerous because of a mental disorder constitutes substantial evidence to support an extension of the defendant's commitment under section 1026.5. [Citations.]' [Citation.]" (*Zapisek*, *supra*, 147 Cal.App.4th at p. 1165.) However, "expert medical opinion evidence that is based upon a ' "guess, surmise or conjecture, rather than relevant,

---

[3] The elements of the medication defense are set forth in CALCRIM No. 3453, which reads in relevant part as follows: "Control of a medical condition through medication is a defense to a petition to extend commitment. To establish this defense, [the NGI defendant] must prove by a preponderance of the evidence that:

"1. [He] no longer poses a substantial danger of physical harm to other because [he] is now taking medicine that controls [his] medical condition;

"AND

"2. [He] will continue to take that medicine in an unsupervised environment." (CALCRIM No. 3453.)

probative facts, cannot constitute substantial evidence." ' [Citations.]" (*In re Anthony C.* (2006) 138 Cal.App.4th 1493, 1504 (*Anthony C.*).)

In the present case, appellant argues that the evidence adduced at trial "did not support the conclusion that there was a substantial danger that [appellant's] schizophrenia would cause him to act in a physically violent, or even physically aggressive manner," and that, "[a]t most, the evidence indicated a substantial danger that [appellant's] schizophrenia might cause him to become *verbally* aggressive." Appellant also argues that the absence of evidence that his minor acts of verbal aggression ever escalated into physical violence demonstrated that appellant "*could* control his potentially dangerous behavior." He notes, moreover, that the court's conclusions were further undermined by its finding that appellant was "medication compliant" and that "he would take his medication when he's outside." (See CALCRIM No. 3453(b)(2).)

We agree with appellant that the evidence presented at his recommitment trial does not support the commitment extension. In particular, we conclude the experts' opinions that appellant represents a substantial danger of physical harm to others and has serious difficulty controlling his potentially dangerous behavior was based on vague generalizations and conjecture, rather than on evidence in the record. (See § 1026.5, subd. (b)(1); *Zapisek, supra,* 147 Cal.App.4th at pp. 1159, 1165; see also *Anthony C., supra,* 138 Cal.App.4th at pp. 1508–1509 [reversing juvenile sex offender's commitment extension, concluding that "[w]hile [the juvenile] may have serious difficulty controlling his sexually deviant behavior, the

19

evidence at trial fails to support such a finding in the absence of a good measure of speculation and conjecture"].)[4]

First, the only evidence presented at trial of appellant's aggression during his 20-year commitment was an incident in September 2017, in which appellant shouted during a therapeutic community meeting that "staff called patients violent when in fact staff was violent"; an incident in August 2015, in which Dr. Mancusi intervened after another patient indicated that appellant was malodorous and appellant shouted at Dr. Mancusi to shut up, that she was on drugs, and that he was going to report her; increased verbal hostility in 2015 after Dr. Laguitan had made some medication changes that caused a significant increase in symptoms, which abated once the medications were readjusted; and unspecified records referred to by Dr. Laguitan from the time of appellant's original admission to Atascadero State Hospital, indicating that during a time when "his illness was not taken care of," it "was associated with aggression and hostility." The doctors also referred to the hostile, aggressive nature of the original offense, when appellant picked up a screwdriver and threatened a man with it, at a time when he was not taking any medications.

All of this evidence, however, merely shows that appellant had on relatively rare occasions engaged in *verbal* outbursts while under these doctors' care, primarily during a limited period when his medications were being adjusted, and that the incident that led to his initial commitment, while extremely aggressive, did not in fact result in *physical* violence and

---

[4] It is curious that the public defender in this case did not seek the assistance of a psychologist or psychiatrist as an expert witness, considering that an NGI defendant in a commitment extension trial is entitled to the same such assistance as a defendant in a criminal trial. (See § 1026.5, subd. (b)(7); cf. *People v. Mitchell* (2005) 127 Cal.App.4th 936, 941.)

took place when he was unmedicated.  Thus, even when he was unmedicated, prior to his commitment, and during the period in which Dr. Laguitan was attempting to adjust his medications, the fact that appellant's hostile behavior never escalated into actual physical violence demonstrates that he could in fact control his dangerous behavior.  Moreover, during his 2011 CONREP release of almost a year, the record reflects that he did not exhibit *any* hostile or aggressive behavior whatsoever.

Second, neither doctor believed appellant posed a danger while in Napa State Hospital, but instead testified vaguely that his failure to engage in his treatment groups and lack of insight into his illness and symptoms could perhaps lead to dangerousness upon his release from the hospital if he did not continue with treatment, particularly if he stopped taking his antipsychotic medications.  Crucially, however, the court expressly found that appellant *would* continue to take his medications if he were released from the hospital.  He had expressed the intent to do so and had acknowledged their positive impact on his symptoms.  Notably, the experts testified that appellant had never refused to take his medications in the hospital and had continued to take them during his CONREP releases.

Furthermore, with respect to his failure to engage in treatment groups, Dr. Laguitan testified that appellant's antipsychotic medication caused significant sedation and negatively affected appellant's ability to engage with treatment professionals and group sessions.  Appellant did not agree that participation in core classes had anything to do with his being dangerous "[b]ecause I'm not harming anybody.  I'm not harming myself.  I'm not aggressive towards anybody else," and he also believed the classes were redundant, "to have to go over them again and again to do the classes that [he had] already taken."  Appellant had, however, expressed both the desire

21

to participate in CONREP and the intent to attend all of the required groups and activities of that program.

The doctors' belief that appellant lacked insight into his mental illness and symptoms was in large part based on his failure to engage in core treatment groups, his failure to understand the nature of the original offense, and his continuing delusions. They believed this lack of insight would increase his risk of dangerousness if he were released because it could lead to a failure to recognize symptoms or take his necessary medications.

First, linking appellant's lack of insight to dangerousness strikes us as highly speculative in the circumstances of this case, especially considering the court's finding that appellant *would* continue to take his medications if released and the lack of testimony at trial that appellant had been physically violent while hospitalized or while out of the hospital on CONREP for nearly a year in 2011, despite both his ongoing delusions and a time when there were issues with the efficacy of his medications. In fact, Dr. Laguitan testified that for the previous year or two, appellant's symptoms of "believing certain things," i.e., his delusions, had *not* translated into him "being imminently dangerous to others. We're able to communicate with him. We have sessions that go on. And we're able to convey thoughts between ourselves, his thoughts to me, and vice versa. [¶] So he's able to function in the unit independently. He goes to his meals and takes his medications." (Compare, e.g., *People v. Sudar* (2007) 158 Cal.App.4th 655, 663–664 [NGI defendant suffered from same delusion that was in effect when he committed arson offense that led to his institutionalization "and consistently maintained that he would do the same thing in the same circumstances"]; *Zapisek*, *supra*, 147 Cal.App.4th at pp. 1166–1167 [NGI defendant had repeatedly acted on his delusions and paranoia in inappropriate ways "so as to impose a danger to

22

others," "such as taping alarm sensors needed for medical emergencies because he believed he was under surveillance, taking steps to escape from the hospital for fear that workmen would return to harm him, or aggressively insisting on money he believed he was owed"]; *People v. Bowers* (2006) 145 Cal.App.4th 870, 879 [NGI defendant "continued to experience auditory hallucinations which commanded her to hurt herself or others," had recently attempted suicide, had poor impulse and anger control, and had a history of assaultive behavior toward others].)

Second, and more importantly, the two experts' opinions that appellant lacked insight is directly contradicted by the record, which contains substantial evidence that appellant possesses considerable insight into his mental illness, his symptoms, and his need for medications. For example, several months before trial, appellant responded to Dr. Mancusi's question regarding whether he believed he had a mental illness with the following: " 'I guess schizophrenia. It just means you have thoughts other people don't have.' " Appellant also said that the schizophrenia comes out in paranoia and anger at his symptoms, and that his symptoms may get worse if he stopped taking his medications. Dr. Mancusi acknowledged that these statements were consistent with appellant having insight that he needs to take his medications to avoid decompensating. Appellant had also told Dr. Mancusi, " 'My anger makes me appear, because I'm a big man, to be a threat. I think a lot of people get away with a lot more than I do. The moment I start to spout out, I seem to be taken very seriously and they think I'm a threat. It means I have to be more aware of my feelings and emotions. Sometimes I think that's why the meds are necessary. It keeps me in check and then no one has a gripe about me really.' " Dr. Mancusi had noted at the time of this statement that, " '[s]imilar to [appellant's] growing acknowledgement of his

23

mental illness, this acknowledgement of the impact of his presentation shows progress.' "

Dr. Laguitan also testified about times appellant had shown insight, including appellant's acknowledgement, over the previous year, that he had a mental illness and accompanying symptoms, "although not necessarily schizophrenia." He had also acknowledged his need for medications, both "to make himself calm" and "to control his anger." According to Dr. Laguitan, appellant believed he suffered from "manic-depressive disorder," rather than schizophrenia. But appellant also "clarified that he wasn't saying that he does not have a mental illness. So the implication of that statement is that he acknowledges some form of mental illness; it's just not schizophrenia." Appellant had also said he would " 'follow up with mental health' " after his release.

Appellant himself testified at trial that he required medication, which kept his mental illness "in check." He also testified that "I have a[n] anger problem, that sometimes has led me into trouble. And I think that it happened and occurred when I was not on my medication." If he did not take his medications, appellant believed he "would decompensate, and be more easily angered in situations, less tolerant of certain people's attitudes, and perhaps carry a bit of prejudice towards certain individuals."

This evidence shows that appellant's insight, while not exalted, is substantial and reflects an understanding that he suffers from a mental illness, that his symptoms include excessive anger, that his size can make him seem threatening, and that he must continue to take his medications to avoid decompensating and keep his mental illness under control. (Compare, e.g., *People v. Kendrid* (2012) 205 Cal.App.4th 1360, 1370 [substantial evidence supported court's order extending NGI defendant's commitment

24

where it was undisputed that defendant had " 'absolutely no insight into his behaviors that lead to . . . violence' "].)

Finally, even if the evidence supported a finding that appellant would represent a substantial danger of physical harm were he to discontinue his medications upon his release, the court specifically found, based on the evidence presented, that appellant *would* continue to take his medications and, as already discussed, the evidence demonstrates that his medications are effective in controlling his mental illness. (See *Bolden*, *supra*, 217 Cal.App.3d at pp. 1600, 1602.)[5] Thus, the evidence shows that appellant established the medication defense discussed in *Bolden* and set forth in CALCRIM No. 3453, proving by a preponderance of the evidence both that he "no longer poses a substantial danger of physical harm to others because he is now taking medicine that controls his medical condition" and that he "will continue to take that medication in an unsupervised environment." (CALCRIM No. 3453; see *Bolden*, at pp. 1600, 1602.)

It is easy to suspect, and many probably do, that a person found not guilty of a serious criminal offense by reason of insanity and committed to a state hospital under section 1026 likely presents "a substantial danger of physical harm to others." That assumption cannot, however, be indulged in a proceeding such as this, because it is inimical to the due process standards governing the civil commitment of mentally ill persons. "The [United States Supreme Court] has repeatedly 'recognized that civil commitment for any

---

[5] In its analysis of the medication defense, after finding that appellant would continue to take his medications upon release, the court stated, "But I just don't see how he's come to grips with what's going on. [¶] And when he believes he's wronged somehow, in a delusional state, I think that I believe he's capable of going off." Like the doctors' testimony, this reason for finding appellant dangerous, even when medicated, does not find support in the record. (See *Anthony C.*, *supra*, 138 Cal.App.4th at p. 1504.)

purpose constitutes a significant deprivation of liberty that requires due process protection.' [Citation.] 'Moreover, it is indisputable that involuntary commitment to a [psychiatric] hospital after a finding of probable dangerousness to self or others can engender adverse social consequences to the individual. Whether we label this phenomena "stigma" or choose to call it something else is less important than that we recognize that it can occur and that it can have a very significant impact on the individual.' [Citation.]." (*In re Howard N.* (2005) 35 Cal.4th 117, 127–128, quoting *Addington v. Texas* (1979) 441 U.S. 418, 425–426.)

Given the importance of the liberty interest at stake, a prosecuting attorney who seeks to extend a civil commitment under subdivision (b) of section 1026.5 must establish not just that the defendant suffers "a mental disease, defect, or disorder," but as well a factual nexus between the defendant's mental deficiency and his or her alleged dangerousness. As earlier noted, in *Zapisek, supra*, 147 Cal.App.4th 1151, a unanimous panel of this court adopted the view expressed by the Third and Fifth Appellate Districts in *People v. Galindo* (2006) 142 Cal.App.4th 531 and *People v. Bowers*, *supra*, 145 Cal.App.4th 870 that section 1026.5 subdivision (b)(1) "should be interpreted as requiring proof that a person under commitment has serious difficulty in controlling dangerous behavior . . . ." (*Zapisek*, at p. 1163.) Moreover, as we have emphasized, section 1026.5 makes clear that the requisite danger must be "of physical harm to others." (§ 1026.5, subd. (b)(1).)

The testimony of the expert witnesses in this case does not show either that appellant ever physically harmed another while confined in the state hospital or that he has difficulty controlling "dangerous behavior" that may result in such harm to others, and the court's finding of dangerousness is

26

therefore not supported by substantial evidence.  (*Zapisek, supra*, 147 Cal.App.4th at p. 1163.)[6]

For all of the reasons discussed, the trial court's order extending appellant's civil commitment for two years must be reversed.[7]

## DISPOSITION

The order extending appellant's commitment is reversed.

---

[6] In *Conservatorship of Roulet* (1979) 23 Cal.3d 219, 235, our high court cited an empirical study noting that " '[i]nformal conversations with judges and attorneys suggest that they defer to psychiatric opinion because they feel they lack the requisite expertise and want to obtain help for those in need.' " (Quoting Hiday, *Reformed Commitment Procedures:  An Empirical Study in the Courtroom* (1977) 11 Law & Society Rev. 651, 665.)  Moreover, while in this case the competence of appellant's counsel is undisputed, it is worth also noting that the inadequacy of counsel for mentally disordered persons in civil commitment proceedings is supported by a surprisingly large number of other studies, many of which are discussed in Morris, *Let's Do the Time Warp Again:  Assessing the Competence of Counsel in Mental Health Conservatorship Proceedings* (2009) 46 San Diego L.Rev. 283, 286–301.  The issue is also addressed in the leading five volume treatise on disability law (Perlin, *Mental Disability Law:  Civil and Criminal* (2d ed. 1998) § 3B-11, pp.  362–363), which asserts that the quality of counsel is "the single most important factor in the disposition of involuntary civil commitment procedures."

[7] In light of our conclusion that substantial evidence does not support the commitment extension, we need not address the other issue appellant has raised on appeal:  whether the extension order must be reversed because the record does not affirmatively establish that he knowingly, intelligently, and unconditionally waived his right to a jury trial.

_____
Kline, P.J.

We concur:

_____
Richman, J.

_____
Miller, J.

*People v. Kerbs* (A155126)

28

Trial Court:                              Sonoma County Superior Court

Trial Judge:                             Hon. Richard P. Kalustian


Attorneys for Appellant:           Under Appointment by the Court of Appeal
Jonathan Soglin
Jeremy Price
Nathaniel P. Miller

Attorneys for Respondent:        Attorney General of California
Xavier Becerra

Jeffrey M. Laurence
Senior Assistant Attorney General

Eric D. Share
Supervising Deputy Attorney General

Elizabeth Hereford
Deputy Attorney General

Alisha M. Carlile
Deputy Attorney General